This Opinion is a
Precedent of the TTAB

Mailed: September 27, 2016

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————

**Trademark Trial and Appeal Board**

————

*In re Integrated Embedded*

————

Serial No. 86140341

————

Steven War of McNeely Hare & War LLP for Integrated Embedded.

April Roach, Trademark Examining Attorney, Law Office 115 (John Lincoski, Managing Attorney).

————

Before Cataldo, Hightower and Heasley,
Administrative Trademark Judges.

Opinion by Cataldo, Administrative Trademark Judge:

Applicant, Integrated Embedded, doing business as "Barr Group," seeks registration on the Principal Register of BARR GROUP (in standard characters, "GROUP" disclaimed) as a mark for the following services:

> IT training services; Training services in the field of design of computer hardware, integrated circuits, communications hardware and software and computer networks for others in International Class 41;
>
> Engineering services in the field of design of computer hardware, integrated circuits, communications hardware and software and computer networks for others in International Class 42; and

> Expert witness services in legal matters in the field of design of computer hardware, integrated circuits, communications hardware and software and computer networks for others in International Class 45.[1]

The Trademark Examining Attorney refused registration of Applicant's mark under Section 2(e)(4) of the Trademark Act, 15 U.S.C. § 1052(e)(4), on the ground that the mark is primarily merely a surname; and under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), based upon likelihood of confusion with Registration No. 2721472 for the mark BARR (in typed or standard characters), in connection with the following services:

> Engineering services; consulting services in the fields of engineering and scientific studies; technical consultation in the field of the environment; professional computer consulting services; computer software and web site design for others in International Class 42.[2]

After the Examining Attorney made the refusals final, Applicant appealed to this Board. Applicant and the Examining Attorney filed briefs.

## *Section 2(e)(4) Surname Refusal*

Section 2(e)(4) of the Trademark Act precludes registration on the Principal Register of a mark which is primarily merely a surname without a showing of acquired distinctiveness under Section 2(f) of the Act, 15 U.S.C. § 1052(f).[3] "The test for determining whether a mark is primarily merely a surname is the primary

---

[1] Application Serial No. 86140341 was filed on December 11, 2013 under Section 1(a) of the Trademark Act, based upon Applicant's allegation of March 6, 2012 as a date of first use of the mark in commerce in connection with all three classes of services.

[2] Registered on the Principal Register on June 3, 2003 with a claim of acquired distinctiveness under Section 2(f), 15 U.S.C. § 1052(f). Section 8 affidavit accepted; Section 15 affidavit acknowledged. First Renewal.

[3] Applicant has not claimed acquired distinctiveness under Section 2(f).

significance of the mark as a whole to the purchasing public." *In re Hutchinson Technology Inc.*, 852 F.2d 552, 7 USPQ2d 1490, 1492 (Fed. Cir. 1988). This expression of the test restates the rule set forth in *In re Kahan & Weisz Jewelry Mfg. Corp.*, 508 F.2d 831, 184 USPQ 421, 422 (CCPA 1975) ("[A] correct resolution of the issue can be made only after the primary significance of the mark to the purchasing public is determined …"); and *In re Etablissements Darty et Fils*, 759 F.2d 15, 225 USPQ 652, 653 (Fed. Cir. 1985). In *In re Benthin Mgmt. GmbH*, 37 USPQ2d 1332, 1333-34 (TTAB 1995), the Board identified several examples of inquiries or "factors" that may lead to evidence regarding whether the primary significance of a term to the purchasing public is merely as a surname.[4]

Applicant submitted as a specimen of use with its application a press release regarding its formation, reproduced in part below:[5]

> "For the last thirteen years, Netrino has been synonymous with high-quality embedded systems education and engineering services," said Netrino founder Michael Barr, an internationally-known expert in

---

[4] In *Benthin*, the Board stated that factors to be considered in determining whether a term is primarily merely a surname include (1) the degree of a surname's rareness; (2) whether anyone connected with applicant has that surname; (3) whether the term has any recognized meaning other than that of a surname; (4) whether the term has the "structure and pronunciation" of a surname; and (5) whether the stylization of lettering is distinctive enough to create a separate commercial impression. Where, as here, the mark is in standard characters, it is unnecessary to consider the fifth factor. *In re Yeley*, 85 USPQ2d 1150, 1151 (TTAB 2007).

These factors are not exclusive nor presented in order of importance. We make our determination on a case-by-case basis, and any of the *Benthin* factors – singly or in combination – and any other relevant circumstances may shape the analysis in a particular case. *See Benthin*, 37 USPQ2d at 1333 (stating that notwithstanding the rareness of BENTHIN as a surname, panel "would find [that it] would be perceived as primarily merely a surname" because of lack of other meanings and because it is name of applicant's Managing Director, but the highly stylized form shifted the balancing of factors to a finding that BENTHIN is not primarily merely a surname).

[5] December 11, 2013 application.

embedded systems and the co-founder and Chief Technology Officer of Barr Group.

In response to a requirement issued by the Examining Attorney, Applicant submitted a substitute specimen in the form of screenshots from its Internet website, reproduced in part below:[6]



Applicant's substitute specimen indicates that individuals may sign up to receive newsletters from Mr. Michael Barr in the field of computer firmware.

With her first Office Action, the Examining Attorney submitted additional screenshots from Applicant's Internet website, reproduced in part below:[7]



---

[6] September 18, 2014 substitute specimen.

[7] March 23, 2014 Office action at 45-46.

This screenshot indicates that individuals may register to view a live address by Michael Barr and participate in live chat with Mr. Barr.

**About Our Namesake**

**Michael Barr, *Chief Technical Officer***



Michael Barr is a former adjunct professor of electrical and computer engineering with over a decade of software design and implementation experience. Internationally recognized as an expert in the field of embedded software process and architecture, Barr has been admitted as a testifying expert witness in U.S. and Canadian court cases involving issues of reverse engineering (including DMCA), interception of encrypted signals (Federal Communications Act), patent infringement, theft of copyrighted source code (including trade secrets issues), and product liability.

Barr is also the author of three books and more than sixty articles and papers on embedded systems. For three and a half years Barr served as editor-in-chief of Embedded Systems Programming magazine. In addition, Barr is a member of the advisory board and a track chair for the Embedded Systems Conference. Software he wrote continues to power millions of products. Barr holds B.S. and M.S. degrees in electrical engineering and has lectured in the Department of Electrical and Computer Engineering at the University of Maryland, from which he also earned an MBA.

Read his blog , follow him on twitter , or view his expert witness resume.

This screenshot indicates that Applicant derived its name and "dba," Barr Group, from Mr. Barr. It lists his qualifications, and invites viewers to read his blog and his resume and to follow him on social media.

  The Examining Attorney also submitted the results of her search of Lexis.com indicating that BARR appears as a surname 13,622 times in its telephone directory listings.[8] The Examining Attorney further submitted the following definition of "group" – "an assemblage of persons or objects gathered or located together, an aggregation; a group of dinner guests; a group of buildings near the road."[9]

---

[8] March 23, 2014 Office action at 49-56.

[9] *Id.* at 42, retrieved from <u>The American Heritage Dictionary of the English Language</u>.

Applicant's specimens and the Examining Attorney's evidence discussed above establish that Mr. Michael Barr is Applicant's eponymous co-founder and its current Chief Technology Officer. Applicant's website promotes its association with Mr. Barr and promotes his credentials and accomplishments; it invites visitors to view Mr. Barr's resume, read his blog and social media postings, and participate in his live presentations. Thus, Mr. Barr is not a historical figure who founded Applicant in the distant past and of whom the public may not be aware. To the contrary, the record evidence establishes that Mr. Barr is an active participant in Applicant's activities under its mark, and that consumers are exposed to his name in several locations on Applicant's website such that consumers are likely to view BARR, as it appears in Applicant's mark, as a surname. *See Miller v. Miller*, 105 USPQ2d 1615, 1620 (TTAB 2013) ("That Applicant's name is [Michele Ballard] MILLER strengthens the inference that the public will perceive the term as a surname."). In addition, the Examining Attorney introduced evidence that over 13,000 individuals in a number of locations throughout the United States bear the surname BARR. Specifically, the evidence lists the names, addresses and telephone numbers of the first 100 of these individuals with the surname BARR, located in 28 states and the District of Columbia. Thus, the surname BARR "is not so unusual that such significance would not be recognized by a substantial number of persons." *Id*; *see also In re Benthin Mgmt. GmbH*, 37 USPQ2d at 1333; *In re Gregory*, 70 USPQ2d 1792 (TTAB 2004). The addition of the disclaimed term GROUP to Applicant's mark merely creates a perception of an assemblage of persons led by an individual named BARR, and is incapable of lending source-

identifying significance to the mark. *See Miller v. Miller,* 105 USPQ2d at 1622 (noting that LAW GROUP is a common designation for an entity comprised of lawyers offering legal services). "This, in itself, is highly persuasive that the public would perceive [the mark] as a surname." *In re Etablissements Darty et Fils*, 225 USPQ at 653. As such, the mark BARR GROUP, considered as a whole in the context of Applicant's services, does not engender a consumer perception beyond that of a surname.

Applicant argues that the United States Patent and Trademark Office (USPTO) has registered numerous marks "that contain the name BARR."[10] Applicant further argues "as such, BARR is not primarily merely a surname and Applicant's applied-for mark should be permitted."[11] With its request for reconsideration of the Examining Attorney's final refusal of registration, Applicant submitted the following third-party registrations (all marks in typed or standard characters unless displayed otherwise):[12]

Registered on the Principal Register -

> Registration No. 3516442 (owned by the same entity as Registration No. 3363072 below) for the mark shown below for a house mark for various chemicals, cleaning products and fuels;



> Registration No. 4223989 for the mark JOHN BARR. THE BEST SCOTCH WHISKY, BARR NONE for various alcoholic beverages ("BEST SCOTCH WHISKY" disclaimed); Registration No. 4208213 for the mark JOHN BARR for alcoholic beverages; and Registration No. 1920061 for the mark shown below for whiskey ("COMPANY" disclaimed);

---

[10] 7 TTABUVE 12.

[11] *Id*. at 13.

[12] 4 TTABVUE 21-69.



Registration No. 4229418 for the mark shown below for transportation logistics services ("FREIGHT SYSTEM" and "LOGISTICS" disclaimed);



Registration No. 4118250 for the mark BARR-CO for perfume, bubble bath and various skin and bath products;

Registration No. 4620243 for the mark shown below for wines and spirits ("MAISON FONDEE A BARR EN 1896" translated as "Company Founded in Barr in 1896" and disclaimed);



Registration No. 4063237 for the mark BARR CODE for blogs in the field of computer hardware, software, computer networks and integrated circuits, and writing articles for others; (this registration is owned by Applicant's asserted "related company Netrino, LLC");[13]

Registration No. 3880982 for the mark BOONE BARR for meal replacement bars and nutritional energy bars ("BAR" disclaimed);

Registration No. 3829208 for the mark shown below for wine ("ESTATE WINERY" disclaimed);



---

[13] 10 TTABVUE 4. Netrino, LLC is listed as the current owner of this registration and there is no evidence regarding the nature of the relationship between Netrino and Applicant. Nonetheless, as discussed above in the press release that Applicant submitted as its original specimen of use, Michael Barr is the founder of Netrino and co-founder of Applicant.

Registration No. 3549921 for the mark BARR + BARR for various clothing items and bags; and Registration No. 2705134 for the mark shown below for various clothing items;



Registration No. 3605289 for the mark shown below for jewelry;

*Nicole Barr*

Registration No. 3241039 for the mark shown below for entertainment by a live musical group, Registration No. 3356820 for various clothing items and Registration No. 3226430 for sound and video recordings;

**NIKI BARR**

Registration No. 2308632 for the mark shown below for soft drinks and syrups for making soft drinks;



Registration No. 2087478 for the mark BARR-NUNN and Registration No. 2091034 for the mark shown below, both for freight transportation;

BARR-NUNN

Registration No. 1924333 for the mark FAMOUS-BARR for retail department store services (subsequently cancelled May 23, 2016);

Registration No. 1213730 (owned by the same entity as Registration No. 0555891 below) for the mark BALM BARR for various skin and body lotions, soaps and creams;

Registered on the Principal Register with a claim of acquired distinctiveness under

Section 2(f) -

Registration No. 2534124 for the mark BARR for a house mark for pharmaceuticals and pharmaceutical preparations;

Registration No. 2594197 for the mark BARR for extruder feed screws;

Registration No. 2721472 for the mark BARR for engineering, engineering consultation, consultation in the fields of the environment and computers, software and website development;[14]

Registration No. 3363072 for the mark BARR for a house mark for various chemicals, cleaning products, fuels, hand tools and rags;

Registration No. 1780103 for the mark displayed below for computers, computer hardware, peripherals and software (subsequently cancelled February 12, 2016);

**BARR**

Registration No. 0555891 for the mark shown below for hand lotions (subsequently cancelled April 1, 2016);

**BALM BARR**

Registered on the Supplemental Register -

Registration No. 2194436 for the mark shown below for soft drinks and preparations for making soft drinks; and



Registration No. 4307050 for the mark MRS. BARR'S NATURAL FOODS for granola and granola snack bars ("NATURAL FOODS" disclaimed).

With regard to this evidence, we first note Applicant's acknowledgment that the third-party registrations "contain the name BARR."[15] Applicant does not argue that consumers would view BARR as a term having a meaning other than a surname. We further note that all of the third-party registrations consisting solely of BARR are registered on the Principal Register with a claim of acquired distinctiveness under

---

[14] As discussed *infra*, this registration was cited as a bar to registration of Applicant's involved mark under Section 2(d).

[15] 7 TTABUVE 12.

Trademark Act Section 2(f), 15 U.S.C. § 1052(f), or on the Supplemental Register. A Section 2(f) claim of acquired distinctiveness is a concession that the mark is not inherently distinctive and therefore not registrable on the Principal Register without a sufficient showing of acquired distinctiveness. *See Yamaha Int'l Corp. v. Hoshino Gakki Co. Ltd.*, 840 F.2d 1572, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988) ("Where, as here, an applicant seeks a registration based on acquired distinctiveness under Section 2(f), the statute accepts a lack of inherent distinctiveness as an established fact."); *In re Leatherman Tool Grp., Inc.*, 32 USPQ2d 1443, 1444 (TTAB 1994). Similarly, marks registered on the Supplemental Register generally are not eligible for registration on the Principal Register, but merely are capable of distinguishing an applicant's goods or services.[16] 15 U.S.C. §§ 1091-1096. The Trademark Act specifically provides that marks that are primarily merely surnames may not be registered on the Principal Register unless the applicant demonstrates acquired distinctiveness under Section 2(f) or, in the alternative, may be registered on the Supplemental Register. As a result, these third-party registrations do not prove that BARR is not primarily merely a surname, nor do they prove that BARR GROUP would not be perceived as primarily merely a surname.

"Even if some prior registrations had some characteristics similar to [applicant's] application, the PTO's allowance of such prior registrations does not bind the Board or this court." *In re Nett Designs Inc.*, 236 F.3d 139, 57 USPQ2d 1564, 1566 (Fed. Cir.

---

[16] Registration of a mark on the Supplemental Register is not an admission that the mark has not acquired distinctiveness. 15 U.S.C. § 1095.

2001). Regardless, we find the third-party registrations largely distinguishable from the case at hand. The third-party registrations issued on the Principal Register without a showing of acquired distinctiveness all include not just BARR but additional wording and/or designs resulting in marks that, as a whole, would be perceived by consumers as not primarily merely a surname. *In re Hutchinson Tech. Inc.,* 7 USPQ2d at 1492. A mark such as  includes BARR which, standing by itself, would be considered primarily merely a surname, but is coupled with a distinctive design element, and would be perceived by consumers as more than primarily merely a surname. *In re Benthin Mgmt. GmbH*, 37 at 1334 (stylized display of BENTHIN is a factor weighing against a finding that the term would be perceived as primarily merely a surname). Similarly, marks such as [BARR-NUNN logo] and [BARR Freight System / LOGISTICS: Raising the BARR logo] include stylization and also present a play on words, e.g., "bar none" and "raising the bar" that detracts from the primary surname significance and are not present in the mark BARR GROUP. The mark BARR CODE also presents a play on words, i.e., "bar code" that creates a meaning other than surname significance. Marks such as **NIKI BARR** and JOHN BARR that include a given name or initials preceding the surname BARR convey the commercial impression of a full personal name and thus are not primarily merely a surname. *See In re P.J. Fitzpatrick,* 95 USPQ2d 1412, 1414 (TTAB 2010) (initials P.J. coupled with surname Fitzpatrick would be perceived as a given name and thus comprises an entire

personal name, not merely a surname). A mark such as **barr + barr** that combines two surnames is not primarily merely a surname, within the meaning of Section 2(e)(4), unless there is evidence of record showing that the combination would be perceived by the public primarily merely as a surname. *See In re Standard Elektrik Lorenz A.G.*, 371 F.2d 870, 152 USPQ 563, 566 (CCPA 1967) (SCHAUB-LORENZ not primarily merely a surname).

Evidence of record establishes that Mr. Michael Barr, Applicant's co-founder and Chief Technical Officer, is prominently featured on Applicant's website. The evidence discussed above from Lexis.com[17] establishes that BARR is not such an unusual surname that it would not be so recognized by a substantial number of persons. *In re Etablissements Darty et Fils*, 225 USPQ at 653. There is no evidence that BARR has another common word meaning such that the "language meaning is likely to be the primary meaning to the public." *Cf. id.* (citing *Fisher Radio Corp. v. Bird Elec. Corp.*, 162 USPQ 265, 266-67 (TTAB 1969) (BIRD not primarily merely a surname due to ordinary language meaning of "bird")). Evidence of record further establishes that GROUP is incapable of lending source-identifying significance to the mark. Given our findings that BARR would be perceived primarily as a surname and that its combination with the term GROUP does not detract from or change the surname significance conveyed by the mark BARR GROUP as a whole, we find that consumers

---

[17] March 23, 2014 Office action at 49-56.

would perceive BARR GROUP as primarily merely a surname and affirm the refusal to register on this ground.

## *Supplemental Register*

In her first Office action, the Examining Attorney advised Applicant that a mark deemed primarily merely a surname is registrable with an acceptable showing of acquired distinctiveness under Trademark Act Section 2(f), 15 U.S.C. § 1052(f), and further advised Applicant that if it could not satisfy one of three enumerated requirements to make such a showing, "applicant can amend the application to seek registration on the Supplemental Register."[18] Applicant did not seek to amend to the Supplemental Register. The Examining Attorney repeated this suggestion in her second Office action.[19] Again, Applicant did not seek to amend at that time, but in its September 18, 2014 communication[20] and April 9, 2015 request for reconsideration,[21] Applicant indicated that "If the Section 2(e)(4) rejection is not withdrawn, Applicant reserves the right to amend the application to seek registration on the Supplemental Register."[22] In her April 15, 2015 denial of Applicant's request for reconsideration, the Examining Attorney explained:

> Applicant's statement that "it reserves the right to amend the application to seek registration on the Supplemental Register" is acknowledged, however since no amendment to the Supplemental Register has been made at this time, either in the alternative or as a response to the refusal,

---

[18] March 23, 2014 Office action at 5. The Examining Attorney further advised Applicant that such an amendment does not overcome the Section 2(d) refusal.

[19] October 9, 2014 Office action at 5.

[20] P. 16.

[21] P. 17.

[22] *Id.*

no further action is being taken by the Examining Attorney with regard to the statement.[23]

Applicant repeats the statement in its main brief.[24] In her brief, the Examining Attorney again notes that Applicant did not make any amendment to the Supplemental Register during prosecution and that such an amendment should not be considered as part of Applicant's appeal.[25] In its reply brief, Applicant argues as follows:

> Marks which are primarily a surname, can be registered as trademarks in the United States once it has acquired distinctiveness. Applicant has used this mark in commerce since at least as early as March 6, 2012. In addition, applicant's related company Netrino, LLC has used the BARR CODE mark (U.S. Registration No. 4063237) (as identified by the examiner) since at least as early as December 28, 2005 – *i.e.*, nearly 10 years. In this case, if applicant's application for registration on the principal register is refused, the mark should be registered on the supplemental register. As admitted by the examiner, Applicant has reserved the right to amend the application to seek registration on the Supplement [sic] Register. While the examiner argues that this amendment should not be considered because the Applicant hasn't actually amended the application to be for the Supplemental Register, the Board has the authority to remand the application to the examiner. *In re Adver. & Mktg. Dev., Inc.*, 821 F.2d 614, 617 (Fed. Cir. 1987).[26]

Applicant also notes in its conclusion that it "has demonstrated that the Section 2(e)(4) refusal should also be withdrawn, or in the alternative, the Board should order that the

---

[23] 5 TTABVUE 5.

[24] 7 TTABVUE 13.

[25] 9 TTABVUE 11 n. 2.

[26] 10 TTABVUE 4.

application be remanded to the examiner for registration on the Supplemental Register."[27]

Despite the Examining Attorney's explanation, Applicant did not amend its involved application either to seek, in the alternative, registration under Section 2(f) based upon a claim of acquired distinctiveness, or to seek, in the alternative, registration on the Supplemental Register. Unlike submitting the amendment in the alternative, the reservation of a supposed right to amend merely indicates a desire to retain the option to amend at some later point in time. Applicant appears to argue that by "reserving its right" in its communications during prosecution and its briefs, it should now be afforded an opportunity to make the amendment and thereby seek registration on the Supplemental Register in the event we affirm the Section 2(e)(4) refusal of registration by remanding the application to the Examining Attorney for that purpose. However, Trademark Rule 2.142(g), 37 C.F.R. § 2.142(g), provides as follows:

> An application which has been considered and decided on appeal will not be reopened except for the entry of a disclaimer under section 6 of the Act of 1946 or upon order of the Director, but a petition to the Director to reopen an application will be considered only upon a showing of sufficient cause for consideration of any matter not already adjudicated.

The Examining Attorney advised Applicant of the option of amending to the Supplemental Register several times, beginning with her first Office action, and Applicant thus was afforded opportunities to seek such an amendment during prosecution of its application. Applicant cannot "reserve a right" that does not exist.

---

[27] *Id*. at 9.

Applicant relies on *In re Adver. & Mktg. Dev., Inc.*, 821 F.2d 614, 2 USPQ2d 2010 (Fed. Cir. 1987). However, that decision does not stand for the proposition that the Board will remand an application to an examining attorney to permit late consideration of an amendment that should have been made during prosecution, in contravention of Trademark Rule 2.142(g). Rather, that decision indicates only that, after oral argument at the Federal Circuit, the parties jointly requested a remand to place additional evidence of applicant's prior use of the mark for the specific services identified in the application, 2 USPQ2d at 2011-12, a very different situation. In contrast, our prior precedents are clear that once the Board has rendered a final decision, a request to amend to the Supplemental Register is not possible. *See also In re Phillips-Van Heusen Corp.*, 63 USPQ2d 1047, 1047 n.2 (TTAB 2002) (denying request in applicant's brief that if the refusals are maintained the application be amended to the Supplemental Register because application which has been decided on appeal will not be reopened); *In re Taverniti, SARL*, 225 USPQ 1263, 1264 n.3 (TTAB 1985) (it has been practice of the Commissioner [now Director] to refuse to reopen, after final decision, for amendment to the Supplemental Register); *In re S. D. Fabrics, Inc.*, 223 USPQ 56, 57 n.1 (TTAB 1984) (after a case has been decided on appeal, an amendment to the Supplemental Register may be accepted only by the Commissioner [now Director] upon petition, and the Commissioner has in past denied petitions to reopen to amend to the Supplemental Register); *In re Dodd Int'l, Inc.*, 222 USPQ 268, 270 (TTAB 1983) (Board denied request to reopen application, after final decision, for amendment to Supplemental Register,

quoting 37 CFR § 2.142(g)); *Ex parte Simoniz Co.*, 161 USPQ 365, 366 (Comm'r 1969) (petition to reopen for amendment to Supplemental Register denied; applicant elected a course of action and had a hearing and an adjudication thereon). *See also* Trademark Board Manual of Procedure ("TBMP") § 1218 (2016) and authorities cited therein.

In view of the foregoing, Applicant's request that we remand the involved application to the Examining Attorney for amendment to the Supplemental Register is denied.

## *Likelihood of Confusion*

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also In re Majestic Distilling Co., Inc.*, 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). We discuss the *du Pont* factors for which Applicant or the Examining Attorney have presented evidence or arguments.

> *Fame of the Cited Mark and Number and Nature of Similar Marks in Use on Similar Goods*

Prior to our discussion of the similarity or dissimilarity of the marks, we consider the strength of the mark in the cited registration, which is the term BARR. Applicant argues that "[t]here is no evidence that the '472 Registration is famous, or that it is entitled to any deference as a famous mark."[28] While we agree that the record does

---

[28] 7 TTABVUE 9.

not establish that the cited mark is famous, the owner of the cited registration is not a party to this *ex parte* appeal, and the Examining Attorney is under no obligation to demonstrate the fame of a cited mark. Thus, we find this *du Pont* factor to be neutral. *See, e.g., In re Thomas*, 79 USPQ2d 1021, 1027 n.11 (TTAB 2006) (fame is not normally a factor in *ex parte* proceedings).

Applicant further argues that the third-party registrations discussed above "show that BARR is weak, diluted, or so widely used that it should not be afforded a broad scope of protection."[29] The "existence of [third party] registrations is not evidence of what happens in the market place or that customers are familiar with them." *AMF Inc. v. Am. Leisure Prods., Inc.*, 474 F.2d 1403, 177 USPQ 268, 269 (CCPA 1973). *See also Jack Wolfskin Ausrustung Fur Draussen GmbH v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015). Third-party registrations can be used "show the sense in which a mark is used in ordinary parlance." *Juice Generation, Inc. v. GS Enters. LLC*, 115 USPQ2d 1671, 1674 (Fed. Cir. July 20, 2015); *In re Box Solutions Corp.*, 79 USPQ2d 1953, 1955 (TTAB 2006). However, the probative value of the third-party registrations in this case is significantly diminished because the trademarks cover a wide variety of goods and services that are not related to the types of services involved here. *See Spoons Rests. Inc. v. Morrison Inc.*, 23 USPQ2d 1735, 1740 (TTAB 1991), *aff'd mem.*, 972 F.2d 1353 (Fed. Cir. 1992). The third-party registrations proffered by Applicant recite such diverse goods as alcoholic beverages, perfume, soft drinks and screws, and such

---

[29] *Id.* at 10.

services as freight transportation and live entertainment by a musical group. The only third-party registrations reciting services that are related to those in the involved application are Registration No. 4063237, owned by Applicant's putative related company, Netrino, LLC, and the cited registration. The probative value of Applicant's evidence is further diminished inasmuch as many of the third-party registrations, as discussed above, also include additional wording and design elements not found in the cited registration or involved application, that engender a different commercial impression from either mark.

Therefore, while the cited mark appears to be a surname and is registered with a claim of acquired distinctiveness under Section 2(f), the evidence does not show that it is entitled to such a narrow scope of protection as to permit registration of a confusingly similar mark for related services. *Cf. Jack Wolfskin,* 116 USPQ2d at 1136 (third-party weakness evidence characterized as "voluminous").

As for the co-existence of the third-party registrations, they simply show that the Office has considered each of the marks and the goods or services in those registrations and determined that the goods and services were sufficiently different from the goods in Registrant's mark to avoid a likelihood of confusion. They do not show that there would be no likelihood of confusion when the services are related.

*Similarities and Dissimilarities of the Marks*

We compare Applicant's mark BARR GROUP and Registrant's mark BARR for similarities and dissimilarities in appearance, sound, connotation and commercial impression. *Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110

USPQ2d 1157, 1160 (Fed. Cir. 2014) (quoting *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F. 3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005)). While we have referenced the two marks one after another for comparison purposes, consumers may not necessarily encounter the marks in such proximity and must rely upon their recollections thereof. *In re Mucky Duck Mustard Co.*, 6 USPQ2d 1467 (TTAB 1988).

In this case, Applicant's mark BARR GROUP wholly encompasses the registered mark BARR, the only difference being the addition of the nondistinctive term GROUP to Applicant's mark which, as discussed above, is disclaimed and descriptive of Applicant's services, namely, that they are provided by an aggregation of persons led by an individual named BARR. As a result, the addition of GROUP in Applicant's BARR GROUP mark is insufficient to distinguish it from the registered mark.

Furthermore, the dominance of BARR in Applicant's mark BARR GROUP is reinforced by its location as the first word in the mark. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin,* 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005) ("Veuve" is the most prominent part of the mark VEUVE CLICQUOT because "veuve" is the first word in the mark and the first word to appear on the label); Presto *Prods. Inc. v. Nice-Pak Prods., Inc.,* 9 USPQ2d 1895, 1897 (TTAB 1988) ("[I]t is often the first part of a mark which is most likely to be impressed in the mind of a purchaser and remembered"). *See also Century 21 Real Estate Corp. v. Century Life of Am.,* 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992) (upon encountering the marks, consumers would first notice the identical lead word). In addition, likelihood of

confusion is often found where the entirety of one mark is incorporated within another. *In re Denisi,* 225 USPQ 624, 626 (TTAB 1985) (PERRY'S PIZZA for restaurant services specializing in pizza and PERRY'S for restaurant and bar services); *Johnson Publ'g Co. v. Int'l Dev. Ltd.,* 221 USPQ 155, 156 (TTAB 1982) (EBONY for cosmetics and EBONY DRUM for hairdressing and conditioner); *In re South Bend Toy Mfg. Co.,* 218 USPQ 479, 480 (TTAB 1983) (LIL' LADY BUGGY for toy doll carriages and LITTLE LADY for doll clothing).

With regard to meaning, as used in connection with the recited services in both marks, the term BARR has no meaning or connotation other than that of a surname. As a result, we find that the marks, when viewed as a whole, are also highly similar in connotation and convey commercial impressions that are far more similar than dissimilar. Thus, even if we afford the mark BARR in the cited registration a limited scope of protection, it nonetheless extends to prevent the registration of such a similar mark.

*Relationship of the Goods, Trade Channels and Classes of Purchasers*

We now turn to the *du Pont* factors involving the similarity or dissimilarity of Applicant's services and Registrant's services, and their channels of trade and purchasers. It is settled that in making our determination, we must look to the services as identified in the application vis-à-vis those recited in the cited registration. *See Octocom Sys., Inc. v. Houston Computers Servs., Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *In re Giovanni Food Co.*, 97 USPQ2d 1990, 1991 (TTAB 2011). It is not necessary that the respective services be competitive, or

even that they move in the same channels of trade to support a holding of likelihood of confusion. It is sufficient that the respective services are related in some manner, or that the conditions and activities surrounding the marketing of the services are such that they would or could be encountered by the same persons under circumstances that could give rise to the mistaken belief that they originate from the same producer. *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012); *In re Melville Corp.*, 18 USPQ2d 1386 (TTAB 1991).

Applicant's services are:

> IT training services; Training services in the field of design of computer hardware, integrated circuits, communications hardware and software and computer networks for others in International Class 41;
>
> Engineering services in the field of design of computer hardware, integrated circuits, communications hardware and software and computer networks for others in International Class 42; and
>
> Expert witness services in legal matters in the field of design of computer hardware, integrated circuits, communications hardware and software and computer networks for others in International Class 45.

The services in the cited registration are:

> Engineering services; consulting services in the fields of engineering and scientific studies; technical consultation in the field of the environment; professional computer consulting services; computer software and web site design for others in International Class 42.

Registrant's "engineering services" encompass Applicant's more narrowly identified "engineering services in the field of computer hardware, integrated circuits, communications hardware and software and computer networks for others." Applicant's services in Class 42 thus are subsumed by Registrant's services, and

legally identical thereto. *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012); *In re Jump Designs, LLC*, 80 USPQ2d 1370, 1374 (TTAB 2006).

In addition, the Examining Attorney, in support of her contention that all three classes of Applicant's services are commercially related to Registrant's services, has made of record examples of web pages from third-party e-commerce sites offering, under the same mark, services such as Applicant's and Registrant's. Among these, we note the following:[30]

- the website at elys.com offers computer hardware and software consulting, electrical and computer engineering and expert witness services in the field of technology.

- the website at wsrcg.com offers computer system and IT consulting and expert witness services in the fields of computer systems and software.

- the website at cosgrovecomputer.com offers engineering services and expert witness services in the fields of computer software.

- the website at xtran-llc.com offers expert witness services, training services and technical consultation in the field of computer software.

- the website at garystringham.com offers consulting, expert witness services and training in the fields of computer engineering, software, firmware and hardware domains.

- the website at prolifogy.com offers computer software consulting, training, and expert witness services.

These websites demonstrate that services of the type offered by both Applicant in all three classes and Registrant are marketed and sold together online under the same marks. *See Hewlett-Packard Co. v. Packard Press, Inc.,* 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002) (evidence that "a single company sells the goods and

---

[30] March 23, 2014 first Office action at 10-44; October 9, 2014 final Office action at 7-25.

services of both parties, if presented, is relevant to the relatedness analysis"). We find that consumers would readily perceive these types of services as being sufficiently related as to be offered by a single business.

Applicant argues that the Examining Attorney's Internet evidence does not establish "that the owner of the '472 Registration offers these [Applicant's] services. In fact, the attached printouts … show that the owner of the '472 Registration does not offer these services."[31] However, it is not necessary for Registrant to offer Applicant's services in order to find that the services are related. *See On-line Careline Inc. v. Am. Online Inc.,* 229 F.3d 1080, 56 USPQ2d 1471, 1475 (Fed. Cir. 2000). The Examining Attorney's evidence shows that third parties provide the types of services offered and advertised by both Applicant and Registrant under a single mark. Such evidence is sufficient to find that the services at issue are related. *See, e.g., In re Toshiba Med. Sys. Corp.,* 91 USPQ2d 1266, 1268-69, 1271-72 (TTAB 2009).

Furthermore, neither Applicant's nor Registrant's identification of services recites any limitations on the channels of trade in which the services may be encountered or the classes of consumers to whom they may be marketed. Thus, the services of Applicant and Registrant are presumed to move in all normal channels of trade and be available to all classes of potential consumers of such services. *See Coach Servs.,* 101 USPQ2d at 1722; *In re Elbaum,* 211 USPQ 639, 640 (TTAB 1981). In each case, the customers would include anyone seeking engineering, computer consultation,

---

[31] 7 TTABVUE 8.

training and expert witness services; and the channels of trade would include any normal trade channel for such services.

*Actual Confusion*

Applicant argues that there is no evidence of any actual confusion and that there has been concurrent use for three years at the time of briefing. We do not accord significant weight to Applicant's contention, unsupported by any evidence, that there have been no instances of actual confusion despite contemporaneous use of the respective marks. The Federal Circuit has addressed the question of the weight to be given to an assertion of no actual confusion by an applicant in an *ex parte* proceeding:

> With regard to the seventh DuPont factor, we agree with the Board that Majestic's uncorroborated statements of no known instances of actual confusion are of little evidentiary value. *See In re Bissett-Berman Corp.*, 476 F.2d 640, 642, 177 USPQ 528, 529 (CCPA 1973) (stating that self-serving testimony of appellant's corporate president's unawareness of instances of actual confusion was not conclusive that actual confusion did not exist or that there was no likelihood of confusion). A showing of actual confusion would of course be highly probative, if not conclusive, of a high likelihood of confusion. The opposite is not true, however. The lack of evidence of actual confusion carries little weight, [citation omitted], especially in an ex parte context.

*Majestic Distilling*, 65 USPQ2d at 1205.

Accordingly, while examples of actual confusion may point toward a finding of a likelihood of confusion, an absence of such evidence is not compelling in support of a finding of no likelihood of confusion. Thus, we cannot conclude from the lack of instances of actual confusion that confusion is not likely to occur.

*Sophistication of Purchasers*

Finally, Applicant argues that consumers who purchase the types of services offered under its mark are sophisticated. In support of this contention, Applicant submitted the declaration of Michael Barr regarding the education level and work experience of Applicant's clients with accompanying charts showing the results of Applicant's survey of its customers and potential customers.[32] The charts show Applicant's clients to have between 5 and 20 or more years' experience in predominantly computer-related job functions.[33] This evidence suggests that Applicant's clients and potential clients are highly experienced in computer hardware, software, and circuitry and computer networks. Even assuming, *arguendo,* that purchases of Applicant's and Registrant's services would involve a deliberative decision, this does not mean that the purchasers are immune from confusion as to the origin of the respective services, especially where, as here, the services are legally identical in part and otherwise related, and offered under the same surname.

In this case, the legal identity or similarity of the services and similarity of the marks outweigh any sophisticated purchasing decision. *See HRL Assocs., Inc. v. Weiss Assocs., Inc.*, 12 USPQ2d 1819 (TTAB 1989), *aff'd,* 902 F.2d 1546, 14 USPQ2d 1840 (Fed. Cir. 1990) (similarities of goods and marks outweigh sophisticated purchasers, careful purchasing decision, and expensive goods.). *See also In re Research & Trading Corp.*, 793 F.2d 1276, 230 USPQ 49, 50 (Fed. Cir. 1986), (citing *Carlisle Chem. Works,*

---

[32] Applicant's April 9, 2015 request for reconsideration at 70-77.
[33] *Id.*

*Inc. v. Hardman & Holden Ltd.*, 434 F.2d 1403, 168 USPQ 110, 112 (CCPA 1970) ("Human memories even of discriminating purchasers ... are not infallible.")).

*Likelihood of Confusion Summary*

We have considered all of the *du Pont* factors for which Applicant or the Examining Attorney have introduced evidence or arguments. The rest we treat as neutral. After considering all of the evidence of record, including any evidence not specifically discussed herein, and arguments pertaining to the *du Pont* likelihood of confusion factors, we find the services are legally identical in part and otherwise related, their channels of trade and classes of consumers are unrestricted and that the channels of trade overlap, and that as used in connection with such services, the marks are highly similar in appearance and sound, and convey a similar connotation and overall commercial impression. The sophistication of consumers we view as neutral or slightly favoring a finding of no likelihood of confusion. However, the legal identity in part and similarity of the services and the similarity between the marks outweigh any sophisticated purchasing decision. In view thereof, we find that Applicant's mark, as used in association with the services identified in the application, is likely to cause confusion with the registered mark used in connection with the services recited in the registration. Taking into account the third-party registration evidence as to BARR, the scope of protection accorded to Registrant's mark still extends to prevent the registration of the similar mark BARR GROUP for legally identical and otherwise related services.

***Decision***: The refusals to register Applicant's mark is affirmed as to all three classes of services under Section 2(e)(4) and Section 2(d) of the Trademark Act.